IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joan Marie Collins, | ) | C/A No.: 1:20-320-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of Honorable David C. Norton, United States District Judge, dated July 24, 2020, referring this matter for disposition. [ECF No. 14]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 13].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses

and remands the Commissioner's decision for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On August 22, 2016, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on February 29, 2016. Tr. at 250–51, 252–59. Her applications were denied initially and upon reconsideration. On November 27, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Alice Jordan. Tr. at 74–119 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 5, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 42–64. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 29, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 79. She graduated high school and attended some college. Tr. at 81–82. Her past relevant work ("PRW") was as a shift supervisor and assistant manager. Tr.

at 82–84. She alleges she has been unable to work since February 29, 2016. Tr. at 250, 252.

### 2.    Medical History

Plaintiff presented to Eric Cole, M.D. ("Dr. Cole"), for diabetes follow up on January 19, 2016. Tr. at 380. She described pain that lasted for a few minutes at a time, started at the top of her neck, and radiated to the left side of her head. *Id.* She also described pain and bruising in her bilateral feet that was caused by bumping them on a piece of metal two days prior. *Id.* She denied checking her blood sugar regularly. *Id.* Dr. Cole observed Plaintiff to be ambulating normally, to have a normal examination of the neck, and to demonstrate ecchymosis to the second, third, and fourth toes on her right foot and the third toe on her left foot. Tr. at 380–81. He noted Plaintiff's hemoglobin A1c was 10%. Tr. at 382. He prescribed 15 units of Novolog three times a day with meals, ordered x-rays of Plaintiff's bilateral feet, prescribed Naproxen 500 mg for cervico-occipital neuralgia, and referred Plaintiff for bariatric surgery consultation. *Id.* X-rays showed mild degenerative joint disease ("DJD") and small calcaneal bone spurs in Plaintiff's bilateral feet. Tr. at 426.

On February 10, 2016, Plaintiff reported her blood glucose was running between 220 and 300 mg/dL, despite use of Metformin 1000 mg twice daily, sliding scale insulin with each meal, and 50 units of Levemir twice daily. Tr.

at 373. She complained of occasional burning in her feet and noted her neuropathy had worsened. Tr. at 374. Dr. Cole observed normal gait and station; normal monofilament wire test and sensation on the dorsum of the bilateral feet; no tactile decrease on the lateral legs and dorsum of the feet, the soles of the feet, or the posterior legs; and intact sensation. *Id.* He advised Plaintiff to increase her insulin to 10 units with each meal and to follow the sliding scale index for correction. *Id.*

Plaintiff presented to Dr. Cole for diabetic follow up on March 10, 2016. Tr. at 367. She was taking 10 units of Humalog three times a day and 50 units of Levemir twice a day and reported her blood glucose continued to average in the 200s in the morning and the 300s in the evening. *Id.* She indicated she was seeing Joseph Paul Ross, III, M.D. ("Dr. Ross"), for possible gastric bypass surgery, maintaining a food log, walking for 30 minutes, and engaging in light weight-bearing exercise. *Id.* She was 5'5" tall, weighed 266 pounds, and had a body mass index ("BMI") of 44.3 kg/m.[2] *Id.* Dr. Cole observed Plaintiff be ambulating normally and noted no abnormalities on physical exam. Tr. at 368. He increased Levemir to 60 units twice a day and Humalog to 12 units, plus a sliding scale for correction. *Id.*

Plaintiff returned to Dr. Cole for a checkup on June 1, 2016. Tr. at 359. She indicated she was no longer taking Atorvastatin because of leg cramps and elevated blood glucose. *Id.* She reported her muscle aches and cramps

had resolved since she stopped the medication. *Id.* She complained of neuropathic pain in her feet and toes that affected her sleep. *Id.* Dr. Cole observed Plaintiff to ambulate normally, but to have diminished/absent sensation, abnormal monofilament wire test, and loss of protective sensation in her bilateral feet. Tr. at 360. He prescribed Gabapentin for diabetic neuropathy and refilled Metformin and Lisinopril. Tr. at 361.

On August 22, 2016, Elizabeth Peters, NP ("NP Peters"), noted Plaintiff had gained 1.8 pounds since her prior visit. Tr. at 845. She indicated Plaintiff had made positive behavioral changes over the prior six months, including eating more fruits and vegetables and consuming at least 60 grams of protein per day and 1000 calories. Tr. at 847. She noted Plaintiff had eliminated caffeine, carbonation, and sugary drinks, had stopped smoking two years prior, was exercising more often, and was drinking approximately one gallon of water each day. *Id.* She stated Plaintiff's next visit would be with the surgeon. *Id.*

On October 12, 2016, Plaintiff complained of sweating, increased thirst, and calluses on her feet. Tr. at 456. She denied having checked her blood sugar over the prior two weeks because she had run out of test strips, but stated it had previously been running between the mid-200s and mid-300s. *Id.* She indicated she was unable to walk because of pain and was experiencing stabbing, tingling, and numbness in her hands and feet. *Id.* She

5

reported being more emotional, crying more, and having increased mood swings. *Id.* Dr. Cole observed Plaintiff to be depressed and in mild distress and noted dryness to her bilateral feet with 1+, non-pitting edema of the left lower extremity and varied pigmentation to the right lower extremity. Tr. at 457–58. He prescribed Duloxetine 60 mg. Tr. at 458.

On November 1, 2016, x-rays of Plaintiff's right hand showed no abnormality. Tr. at 439.

Plaintiff presented to consultative examiner Lary R. Korn, D.O. ("Dr. Korn"), for an orthopedic assessment on November 8, 2016. Tr. at 441. She reported a history of poorly-controlled, insulin-dependent diabetes with neuropathy in her fingers and toes. *Id.* She endorsed diminished sensation that sometimes caused her difficulty when picking up items. *Id.* She reported a history of carpal tunnel syndrome ("CTS") that had previously been treated successfully with injections and without surgery. *Id.* She complained of swelling in her left foot with a history of multiple sprains and traumas. *Id.* Dr. Korn noted normal findings on a mental status exam ("MSE"). Tr. at 442. He noted Plaintiff was 5' 4 ½" tall and weighed 270 pounds. *Id.* He observed "a couple of millimeters of pitting pretibial edema in the lower portion of the legs bilaterally" and "some additional edema in the left foot that does not necessarily pit." *Id.* He noted normal flexion of Plaintiff's cervical spine with extension limited by soft tissue barriers to about 20 degrees, left rotation to

56 degrees, and normal right rotation. Tr. at 443. He recorded normal exams of the lumbar spine, shoulders, elbows, right wrist, hips, ankles, and hands. *Id.* He noted left wrist palmar flexion to 44 degrees with "an old distal forearm fracture with some valgus angulation of the distal forearm and a prominent distal ulna," as well as mild lateral compartment crepitus in the left knee with McMurray's maneuver. *Id.* He stated Plaintiff's left foot appeared "grossly bigger than the right foot due to the swelling that encompasses the midfoot and forefoot" such that Plaintiff could not actively flex any of the metatarsophalangeal ("MTP") joints of the left foot beyond the neutral position or flex her toes with passive assist. *Id.* He indicated Plaintiff could squat, but was unable to heel-toe walk or tandem walk. *Id.* He described Plaintiff's gait as having "a somewhat widened base" and involving rotation of her foot, without a dominant limp. Tr. at 444. He noted no assistive device, muscle weakness, atrophy, or tremor. *Id.* He observed normal reflexes in the forearms and patellae, but absent reflexes in the Achilles. *Id.* He described mild loss of two-point discrimination in all the digits of the left hand and the fourth and fifth digits of the right hand. *Id.* He stated Plaintiff had loss of sensation to light touch at the tips of her toes on monofilament testing of the feet. *Id.* He noted Plaintiff's fine dexterity appeared to be reasonably normal. *Id.* He diagnosed diabetic peripheral

neuropathy, possible diabetic foot changes, posttraumatic DJD of the left wrist, severe morbid obesity, and right CTS. *Id.*

On November 10, 2016, Plaintiff reported poorly-controlled diabetes. Tr. at 453. She indicated she had stopped taking Cymbalta because it made her feel "awful." *Id.* She stated Gabapentin was not helpful and Lyrica was too expensive. *Id.* She described her pain as worsened by range of motion ("ROM"), standing and sitting for extended periods, and extended activity. *Id.* She said she had trouble feeling the keyboard when typing. *Id.* Dr. Cole noted obesity, but otherwise normal findings on exam. Tr. at 453–54. He instructed Plaintiff to increase Novolog to 20 units three times a day and prescribed Tramadol 50 mg for diabetic neuropathy. Tr. at 454.

On December 9, 2016, Plaintiff reported her blood glucose consistently ranged from the mid- to high-200s. Tr. at 575. She complained that her blood glucose had not decreased even though she was not "eating junk" or drinking soda. *Id.* She denied being able to exercise because severe neuropathy affected all her extremities. *Id.* She indicated Tramadol had helped to decrease her stabbing pain to allow her to sleep. *Id.* She complained of progressively worsening pain in her hands that had become unbearable over the prior couple of months. *Id.* Dr. Cole noted decreased temperature on the dorsum of the bilateral feet and left ankle and foot edema. Tr. at 576–77. He increased Levemir to 60 units twice a day and Novolog to 25 units three

times a day with additional insulin per the sliding scale index. Tr. at 577. He referred Plaintiff to a neurologist and an endocrinologist. *Id.*

On December 29, 2016, State agency medical consultant Earle Sittambalam, M.D. ("Dr. Sittambalam"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance; and occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. Tr. at 127–29.

On January 4, 2017, state agency consultant Anna P. Williams, Ph.D. ("Dr. Williams"), reviewed the record and noted that they mentioned depression and tearfulness, but no mental impairments had been alleged and no mental diagnosis had been provided. Tr. at 126.

Plaintiff presented to Everette Joseph Walton, Jr., M.D. ("Dr. Walton"), for a diabetes and endocrinology evaluation on February 10, 2017. Tr. at 462. She reported her blood glucose was typically around 200 mg/dL in the morning and 300 mg/dL prior to her evening meal, despite taking 55 units of Levemir every 12 hours, 25 units of insulin prior to each meal, and Metformin twice a day. *Id.* She complained of severe neuropathy and indicated she was unable to tolerate medications for neuropathy other than

9

Tramadol. *Id.* She described painful numbness, burning, and intermittent sharp, stabbing pain. *Id.* Dr. Walton noted absent protective sensation, slightly dusky color, and trace edema in both feet. Tr. at 463. He noted Plaintiff's neuropathy "prevents exercise pretty much" and that bariatric surgery was likely her best option. *Id.* He instructed Plaintiff to increase Levemir to 70 units every 12 hours and to take 30 units of insulin prior to breakfast and 40 units prior to dinner. *Id.* He added Amitriptyline for neuropathy. *Id.*

Plaintiff followed up with Dr. Cole for anxiety and depression on February 17, 2017. Tr. at 572. Dr. Cole noted Plaintiff was tearful and expressed feelings of fatigue and pain. *Id.* He noted normal findings on physical exam. Tr. at 573. He referred Plaintiff to a mental health counselor. *Id.*

Plaintiff presented to Spartanburg Area Mental Health Center for an initial clinical assessment on March 10, 2017. Tr. at 719. She reported increased depression and crying spells after being fired from her job in February 2016 and experiencing severe pain from neuropathy. *Id.* She indicated she had not started Sertraline because she was afraid of its side effects. *Id.* Katherine S. Garland, MRC ("Ms. Garland"), observed the following on MSE: clean appearance and hygiene; appropriate motor activity; cooperative attitude during interview; tearful affect; depressed mood; normal

rate and tone of speech; normal thought process; ideas of hopelessness and worthlessness; no evidence of hallucinations or delusions; alert and oriented to person, place, time, and situation; poor decisionmaking that adversely affects self and others; acknowledges, but fails to understand problems; intact memory; easily distracted and daydreams; and average fund of knowledge. Tr. at 721–22. Plaintiff reported insomnia and short intervals of sleep, averaging three to four hours per night. Tr. at 722. She endorsed decreased appetite, weight changes, decreased energy, and fatigue. *Id.*

On March 20, 2017, a second state agency medical consultant, James Upchurch, M.D. ("Dr. Upchurch"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; stand for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; avoid concentrated exposure to extreme heat; and avoid even moderate exposure to hazards. Tr. at 155–58.

On March 23, 2017, state agency consultant Michael Hammonds, Ph.D. ("Dr. Hammonds"), reviewed the evidence and concluded that no medically-determinable mental impairment had been established. Tr. at 152.

Plaintiff presented to Kenneth Drummond, R.N. ("Nurse Drummond"), for medication monitoring on April 7, 2017. Tr. at 723. Nurse Drummond observed that Plaintiff was pleasant, calm, fully oriented, well-groomed, and had a tearful affect and normal speech. Tr. at 724. He noted Plaintiff cried throughout the session. *Id.* Plaintiff complained of two incidents of heart racing and shortness of breath since starting Sertraline. *Id.* She reported being in constant pain from neuropathy, but admitted she had not been diagnosed with fibromyalgia. *Id.*

On April 18, 2017, Plaintiff reported Sertraline was helping with her crying and anger. Tr. at 569. She continued to complain of neuropathic pain in her feet, but indicated it was no longer "stabbing pain." *Id.* She endorsed pain "all over some days." *Id.* She reported a bruise and pain in her left foot. *Id.* She requested a handicapped placard. *Id.* Dr. Cole observed morbid obesity, ambulation with a cane, depressed mood, and no tenderness or edema in the bilateral feet. Tr. at 559–60. He prescribed Lyrica and ordered x-rays of the left foot and left ankle brachial index with arterial Doppler and toe pressures. Tr. at 560. He assessed uncontrolled diabetes, left foot pain, fibromyalgia, and diabetic peripheral neuropathy. *Id.* X-rays of Plaintiff's left foot showed no acute fracture or dislocation. Tr. at 624.

Plaintiff presented to psychiatrist Vonda K. Gravely, M.D. ("Dr. Gravely"), for an initial psychiatric medical assessment on April 20, 2017. Tr.

at 725. She reported Zoloft helped with her anger and improved her mood. *Id.* She endorsed a history of panic attacks, but denied having experienced any over the prior year. *Id.* Dr. Gravely observed that Plaintiff cried throughout the visit. *Id.* She noted Plaintiff walked with a cane due to osteoarthritis. Tr. at 726. She stated Plaintiff had depressed mood, labile affect, and fair insight and judgment. *Id.* She diagnosed severe, recurrent major depressive disorder ("MDD"), panic disorder, and generalized anxiety disorder ("GAD"). *Id.* She instructed Plaintiff to increase Sertraline such that she would take one-and-a-half pills per day for 14 days and then two pills per day to achieve a daily dose of 100 mg. *Id.*

On April 27, 2017, vascular studies of Plaintiff's lower extremities showed no significant peripheral artery occlusive disease in the left or right lower extremity. Tr. at 622–23.

Plaintiff followed up with Nurse Drummond for medication monitoring on May 25, 2017. Tr. at 727. She denied side effects and adverse reaction to Sertraline. Tr. at 728. Nurse Drummond noted that Plaintiff displayed less crying than during the prior visit. *Id.* Plaintiff requested that Nurse Drummond inform Dr. Gravely that she had a history of obsessive compulsive disorder ("OCD") such that she had to wipe doorknobs many times before entering or exiting. *Id.*

13

Plaintiff followed up with Dr. Gravely on June 8, 2017. Tr. at 729. She reported a history of OCD that she was working through with her counselor. *Id.* She indicated she was doing much better overall and did not desire to increase her medication dose. *Id.* Dr. Gravely noted obsessions were present, but otherwise indicated normal findings on MSE. *Id.*

Plaintiff also followed up with Dr. Ross on June 8, 2017. Tr. at 890. Dr. Ross noted 1+ dorsalis pedis and posterior tibial pulses and +1 pitting edema in the bilateral lower extremities. Tr. at 892–93. He discussed gastric bypass surgery, healthy behaviors, diet, nutrition, exercise, and goal-setting and noted Plaintiff would be undergoing bariatric surgery in the near future. Tr. at 893.

On June 12, 2017, Plaintiff reported she had been unable to fill her Lyrica prescription. Tr. at 565. She indicated Sertraline had improved her mood and decreased her crying spells. *Id.* She requested that Dr. Cole complete a form for disability, but he declined. *Id.* Dr. Cole noted morbid obesity, ambulation with cane, and no tenderness or edema in Plaintiff's bilateral feet. Tr. at 566.

Plaintiff underwent an esophagogastroduodenoscopy ("EGD") with biopsy that showed morbid obesity and gastroesophageal reflux disease ("GERD") on June 22, 2017. Tr. at 894–95.

On June 28, 2017, Dr. Walton noted Plaintiff was at the point of beginning a liquid diet in preparation for bariatric surgery. Tr. at 517. He did not expect that Plaintiff would require her pre-meal insulin while on a liquid diet. *Id.* He stated Plaintiff's hemoglobin A1c was down to 8.1%. *Id.* He sensed protected sensation in one of two sites tested on each of Plaintiff's feet. Tr. at 518. He observed no edema. *Id.* He recommended Plaintiff eliminate pre-meal insulin and start decreasing Levemir. *Id.* He indicated she should continue Metformin until her blood sugars were completely normal. *Id.*

Plaintiff was hospitalized at Spartanburg Regional Healthcare System from July 11 to July 13, 2017. Tr. at 927. Dr. Ross performed laparoscopic gastric bypass surgery. Tr. at 927. Plaintiff's blood glucose decreased from 200 upon admission to 140 at discharge, without medication. *Id.* Dr. Ross discharged Plaintiff with instructions to follow a bariatric diet and use Percocet for pain. Tr. at 928.

On September 7, 2017, Plaintiff reported insomnia since undergoing gastric bypass surgery. Tr. at 731. She indicated her OCD had worsened immediately after surgery, but was improving. *Id.* Dr. Gravely noted normal findings on MSE. *Id.* She continued Plaintiff's medication and recommended she continue therapy for at least a few more months. Tr. at 732.

On November 13, 2017, Dr. Walton noted Plaintiff had taken no diabetes medication since her gastric bypass procedure and her hemoglobin

A1c had decreased to 5.7%. Tr. at 518. He stated Plaintiff had lost about 65 pounds since the surgery and was very pleased with herself. *Id.* Dr. Walton examined Plaintiff's feet noting protective sensation sensed in one of two sites on each foot. Tr. at 519. He stated Plaintiff still had no vibration sense in her toes, but quite acute vibration sense in her ankles. *Id.* He indicated Plaintiff should remain off her diabetes medications and authorized her to discontinue Lisinopril, as she was experiencing lightheadedness upon standing and promised to restart it if she obtained no benefit. *Id.*

Plaintiff complained of a one-month history of tailbone pain on December 11, 2017. Tr. at 560. She indicated she had been exercising more frequently, but did not recall any activity that could have caused trauma to the area. Tr. at 562. Dr. Cole observed Plaintiff to be morbidly obese, ambulating with a cane, and tender over the coccyx. Tr. at 563. He ordered a computed tomography ("CT") scan of the sacrum and coccyx. *Id.*

On December 18, 2017, a CT scan of Plaintiff's lumbar spine showed mild L4–5 spinal stenosis. Tr. at 619.

Plaintiff returned to Dr. Gravely for routine follow up on December 27, 2017. Tr. at 733. She requested that Sertraline be increased to 150 mg per day. *Id.* Dr. Gravely noted Plaintiff had "on-going severe OCD that [was] quite disabling" and had "great difficulties going out of the home." *Id.* She stated Plaintiff appeared to have a relapse of depression and a lower

frustration tolerance. *Id.* She noted Plaintiff was significantly tearful. *Id.* She observed present obsessions, depressed mood, and anxious affect on MSE. *Id.* She increased Sertraline to 150 mg per day. Tr. at 734.

Plaintiff reported doing extremely well and indicated her diabetes was in remission on January 19, 2018. Tr. at 1203. She complained of a knot around her umbilicus that was sore to touch. *Id.* Dr. Ross evaluated it, but did not feel a hernia. *Id.* He advised Plaintiff to inform him if it worsened so he could order a CT scan. *Id.*

On January 22, 2018, Plaintiff complained of pain in her right great toe, after pulling a piece of skin from beside her toenail four days prior. Tr. at 528. Jennifer Dawn Mabry, NP ("NP Mabry"), noted cellulitis and pain around the toe that radiated into the right foot. *Id.* She indicated Plaintiff was draining a small amount of serous fluid from the medial aspect of her right great toe and had erythema surrounding it. Tr. at 529. She obtained a culture and prescribed Keflex. *Id.*

Plaintiff followed up with Dr. Cole on January 29, 2018. Tr. at 553. She reported her toe had improved, but continued to be mildly painful and erythematous. Tr. at 555. Dr. Cole assessed an improving infection of the right great toe and an ingrown toenail. Tr. at 556. He referred Plaintiff to a podiatrist. *Id.*

Plaintiff presented to James H. Storch, PT ("PT Storch"), for a physical therapy evaluation on January 30, 2018. Tr. at 485. She described a constant dull ache and intermittent burning, pinching, or stinging in her low back with prolonged sitting and standing and soreness in her lumbosacral region with transitioning to standing after prolonged sitting. *Id.* PT Storch noted normal bilateral quadriceps reflexes and absent Achilles reflexes. *Id.* He described Plaintiff's trunk strength as poor-to-fair and noted neuropathy in all four extremities. Tr. at 486. He stated tailbone discomfort was produced with left lower extremity tensioning. *Id.* He noted minimal loss in active ROM and increased pain with lumbar flexion and moderate loss of active ROM and greater increase in pain response with lumbar extension. *Id.* He recommended skilled physical therapy to increase trunk and lower extremity strength and balance training. Tr. at 487. Plaintiff followed up for physical therapy on February 14, 20, 22, and 27 and March 2, 7, 9, 14, 16, and 21. Tr. at 489–514.

Plaintiff presented to Paul Anthony Lepage, M.D. ("Dr. Lepage"), for a right great toe infection on February 9, 2018. Tr. at 474. She reported having continued drainage from the site, despite using hot soaks and oral Doxycycline. *Id.* She also complained of an ingrown toenail and neuropathy. *Id.* Dr. Lepage noted Plaintiff walked with a cane. Tr. at 476. He indicated Plaintiff weighed 200 pounds. Tr. at 477. He observed an ingrown toenail in

Plaintiff's right great toe that was draining purulent material with some erythema of the toe. *Id.* He excised the ingrown toenail. Tr. at 478–79. Plaintiff's right great toe had healed upon follow up on February 23, 2018. Tr. at 479.

Plaintiff reported during a March 2, 2018 physical therapy session that her hands and feet always felt like they were asleep and waking up with a tingling and burning sensation, but were not quite as bad as they had been prior to her gastric bypass surgery. Tr. at 498.

On March 9, 2018, physical therapy assistant Rachel Honshell ("PTA Honshell"), observed that Plaintiff seemed to be in pain throughout the session "as noticed in her slow movement pattern and low tolerance to exercise." Tr. at 505.

On March 16, 2018, PTA Honshell noted Plaintiff continued to have difficulty maintaining balance during marches and tandem walking and had low exercise tolerance secondary to back pain. Tr. at 510.

On March 21, 2018, PTA Honshell indicated Plaintiff was being discharged, but should continue her aquatic home exercise plan independently by visiting the local Young Men's Christian Association ("YMCA") facility. Tr. at 513.

Plaintiff's hemoglobin A1c was 5.7% on April 16, 2018, and she reported her home blood glucose readings were below 100 mg/dL. Tr. at 521.

Dr. Walton examined Plaintiff's feet noting no vibration sense in her toes and protective sensation sensed in one of two sites on each foot. Tr. at 521.

Plaintiff followed up with Dr. Gravely for psychiatric medication management on April 18, 2018. Tr. at 735. She indicated she was tolerating the increased dose of Zoloft and considered it helpful. *Id.* Dr. Gravely noted Plaintiff's obsessions were present, intense, and ongoing. *Id.* She observed Plaintiff's mood to be depressed and anxious and her affect to be labile and very tearful at times. *Id.* She assessed a primary diagnosis of OCD, and additional diagnoses of MDD, panic disorder, and GAD. *Id.* She continued Plaintiff's medication. Tr. at 736.

Plaintiff presented to Christopher Todd Henderson, NP ("NP Henderson"), on April 30, 2018, after having sustained a fall and injured her left wrist. Tr. at 530. NP Henderson observed Plaintiff's left wrist to be edematous over the styloid process of the left ulna and very tender to touch. *Id.* He noted full ROM of the hand and wrist and demonstrated pronation and supination of the left forearm. *Id.* He assessed a left wrist contusion and issued a Velcro splint. Tr. at 531.

On May 8, 2018, Plaintiff complained of left wrist pain that was radiating up her arm and causing nausea. Tr. at 547. Dr. Cole noted tenderness and limited ROM with pain just distal to the lateral epicondyle on the left. Tr. at 549. He referred Plaintiff to an orthopedist. Tr. at 550.

On May 18, 2018, magnetic resonance imaging ("MRI") of Plaintiff's left wrist showed a tear through the triangular fibrocartilage complex ("TFCC"), degenerative arthrosis along the dorsal aspect of the radial carpal articulation, and mild tenosynovitis of the extensor carpi ulnaris tendon. Tr. at 616–17.

On June 12, 2018, Plaintiff presented to Alesia Jeanette Jones, D.O. ("Dr. Jones"), for a swollen insect bite on her right fourth finger. Tr. at 531. Dr. Jones assessed cellulitis of the right fourth finger and prescribed Doxycycline. Tr. at 533.

Plaintiff complained of a one-month history of left toe pain and swelling on July 17, 2018. Tr. at 541. She was 5'4" tall, weighed 195 pounds, and had a BMI of 33.5 kg/m.[2] *Id.* She noted she had stubbed and someone had subsequently stepped on her left third toe. Tr. at 542. She stated the pain made walking difficult. *Id.* Plaintiff also complained of a callus on her left great toe. Tr. at 543. Dr. Cole observed Plaintiff to be ambulating with a cane, to have limited ROM and tenderness in her left third toe, to demonstrate irregular gait due to left foot pain, and to have an infected callus on her left great toe. Tr. at 543. He advised Plaintiff to wear a walking boot for six weeks and prescribed Cephalexin 500 mg for the infected callus on her left great toe. Tr. at 542–43. He also referred Plaintiff for wound care. Tr. at 544.

X-rays of Plaintiff's left foot dated July 17, 2018, show calcaneal spurs. Tr. at 614.

On July 20, 2018, Plaintiff reported doing great overall. Tr. at 1518. She indicated she was eating and drinking without nausea and vomiting and had no acid reflux, abdominal pain, or bowel changes. *Id.* Dr. Ross noted Plaintiff was not exercising due to a wound on her left great toe, but encouraged her to incorporate cardiovascular and strength training exercises into her routine. *Id.*

On August 15, 2018, Dr. Gravely recommended Plaintiff engage in water aerobics and gentle exercise to help with pain and emotional well-being. Tr. at 737. She indicated Plaintiff had a depressed mood and labile affect. *Id.* Plaintiff did not desire to start Buspar. *Id.*

On August 21, 2018, Plaintiff presented to Susan Olson Hilsman, M.D. ("Dr. Hilsman"), for treatment of a nonhealing ulcer on her left great toe. Tr. at 741. She endorsed gait disturbance, falls, generalized weakness, and decreased sensation on a review of systems. Tr. at 742. Dr. Hilsman observed 2/4 bilateral dorsalis pedis and posterior tibial pulses, a superficial wound on the plantar surface of Plaintiff's left great toe, mild swelling and redness throughout the left great toe, scant left toe drainage, gait disturbance, and decreased sensation. Tr. at 743. She assessed an ulcer of the left great toe with breakdown of the skin and a diabetic ulcer of the left foot secondary to

type 2 diabetes. Tr. at 746. Dr. Hilsman counseled Plaintiff in proper footwear, as she arrived wearing flip flops. Tr. at 747. She instructed Plaintiff to clean the wound with mild soap, apply xeroform, keep the wound covered at all times, and offload with a modified postoperative shoe. *Id.*

On September 11, 2018, Robert Lawrence Helmer, M.D. ("Dr. Helmer"), noted an MRI of Plaintiff's left forefoot was unremarkable and provided no findings to clearly explain her complaints of pain. Tr. at 612.

A record from Emerge Therapy Center and Teaching Clinic dated September 11, 2018, reflects that Plaintiff attended 32 therapy sessions between February 21, 2017, and August 14, 2018, and remained active in therapy. Tr. at 716. It reflects diagnostic impressions of OCD, mild and recurrent MDD, and religious/spiritual problems. *Id.* The therapist notes Plaintiff was making good therapeutic use of her time and had made good progress, with therapy focusing on her chronic pain and related issues such as inability to work and earn an income. *Id.*

On November 6, 2018, x-rays showed degenerative changes to Plaintiff's cervical spine and no acute abnormality to the right shoulder. Tr. at 783.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing, Plaintiff testified she was 5'5" tall, weighed 195 pounds, and was right-handed. Tr. at 79. She stated she was divorced and had an adult daughter. Tr. at 80.  She said she lived in her sister's mobile home with her sister and her sister's fiancé. *Id.* She stated she received food stamps and her sister paid all her other bills. *Id.* She denied having received a worker's compensation settlement or unemployment and said she did not have medical insurance. Tr. at 81. She said she graduated high school in 1991 and attended a year of college for business operations. *Id.* She denied having obtained a degree, but indicated she had received management certificates through her former employer. *Id.* She said she last worked as a shift supervisor at Advance Auto Parts from 2011 to February 2016. Tr. at 82–83. She described her role as counting inventory, stocking shelves, installing batteries in cars, and performing diagnostic checks on customers' cars. Tr. at 82. She stated she lifted more than 50 pounds every day. Tr. at 83. She said she stopped working in 2016 when her diabetes and neuropathy worsened to the point that she was unable to perform her job duties and was laid off after a merger. Tr. at 83–84. She said she looked for another job upon being terminated, but was unable to find anything she could do. Tr. at 84.

24

Plaintiff said she had previously worked for Travel Centers of America from 2002 to 2011 as an assistant manager in a diesel mechanic shop. Tr. at 83–84. She described her role as stocking shelves and supplying parts for the mechanics. Tr. at 85. She said the parts weighed between 60 and 100 pounds. *Id.*

Plaintiff said she was unable to work because of neuropathy from her diabetes, fibromyalgia, spinal stenosis, bulging disc, CTS and arthritis in her hands and wrist, torn cartilage in her left wrist, anxiety, and OCD. Tr. at 85–86. She said she sat around watching television for 10 to 12 hours a day, getting up to move around or lie on her back. Tr. at 86. She said her family and friends visited her, and she denied belonging to any club, organization, or church. Tr. at 86–87. She said she read mysteries, could microwave meals and make sandwiches, but could no longer cook, do laundry, clean dishes, vacuum, mop, sweep, clean bathrooms, or perform any other household chores or yardwork. Tr. at 87–88. She said her sister did most of the grocery shopping, but she accompanied her to the store. Tr. at 88. She acknowledged having a driver's license and having driven a couple of days prior to a store and back, but denied the ability to drive long distances because she could not feel her feet or hands. *Id.* She said she still visited the grocery store and Dollar Store. *Id.* She noted cooking had been her hobby, but she was no longer able to cook or engage in any other hobbies. Tr. at 89. She said she

would go outside for fresh air, but did not walk very far. *Id.* She admitted she was able to shower on her own, but said she only did so when someone else was in the house because she would often fall. *Id.* She denied smoking, drinking, doing recreational drugs, or having had a problem with them in the past. *Id.*

Plaintiff said her fibromyalgia and neuropathy were her most severe physical problems that prevented her from looking for a job. Tr. at 89–90. She said her primary care physician diagnosed her fibromyalgia in 2016. Tr. at 90. She stated it caused her constant pain all over, including her hair. *Id.* She said diabetes caused neuropathy in her hands and feet. Tr. at 90–91. She estimated she was diagnosed with diabetes 15 or more years prior. Tr. at 91. She said she had taken five insulin injections per day prior to her gastric bypass surgery, but was no longer on insulin or pills for diabetes. *Id.* She said her diabetes was controlled, but she still had neuropathy and fibromyalgia. *Id.* Plaintiff acknowledged having participated in physical therapy for her back, but denied the ability to exercise due to the neuropathy in her hands and feet that made it difficult for her to walk a long way without stumbling or falling. Tr. at 92. She also said the arthritis and pain in her back made it difficult to walk a lot. *Id.*

Plaintiff testified she was bothered by her OCD, anxiety, and depression. *Id.* She noted seeing a therapist, who helped her realize her

anxiety was mostly from dealing with all the pain and not being able to do a lot for herself, as she was used to doing. *Id.* She said she experienced panic attacks that caused her heart to race. Tr. at 93. She stated that if she experienced a panic attack while in a store, she would have to excuse herself to the car or restroom to ground herself, restore her breath, and stop crying. *Id.* She said she experienced panic attacks only a couple of times a month because she tried to stay to herself and not go out a lot. Tr. at 94. She said she took generic Zoloft for her anxiety, but her psychiatrist said she was on the maximum dose, so she may need to add something else. *Id.* She reported her high blood pressure was under control. Tr. at 94–95. She said her primary care physician, Dr. Cole, diagnosed her with arthritis in her spine, hands, knees, and feet, after a CT of her spine showed stenosis, some arthritis, and a bulging disc. Tr. at 95. She denied taking medication for osteoarthritis. *Id.* She said she had been prescribed Lyrica, but did not have insurance to obtain it. Tr. at 95–96. She said she had reacted poorly to Cymbalta and discontinued it due to weakness and lethargy. Tr. at 96. She did not recall having been prescribed Neurontin. *Id.* She denied other side effects from medications. *Id.* She estimated she could sit or stand for 20 to 30 minutes, walk 15 to 20 minutes, and lift seven or eight pounds. Tr. at 97. She said it was very painful to bend. *Id.* She said she could climb stairs, but not a lot, and required her cane or a rail to maintain her balance. Tr. at 98.

In response to questions by her counsel, Plaintiff testified she had used a cane outside her home since 2016. *Id.* She confirmed that neuropathy caused her feet to change colors and rendered her unable to feel anything with her feet. *Id.* She said she had a complete tear in her left wrist from a fall. Tr. at 99. She said she had worn a brace on her left due to the tear and on her right due to CTS since May 2018. *Id.* She said she had no feeling in her fingers, which affected her ability to pick up and hold objects, and she felt pain on the insides of her hands that increased with prolonged use. *Id.* She said she was would drop dishes and was unable to do household chores because of her pain. Tr. at 100. She said if she had not lost her job, she would have tried to continue to work. *Id.*

In response to the ALJ's question, Plaintiff said she had experienced neuropathy before being diagnosed with it two years prior. Tr. at 101. She said diabetes had initially caused her to lose weight, but she had gained weight upon starting insulin. *Id.* She said she had weighed 330 pounds at her heaviest, but weighed 270 pounds at the time of her gastric bypass surgery in July 2017 and had lost down to 195 pounds. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") William W. Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 105–17. The VE categorized Plaintiff's PRW at Advance Auto Parts as a combination of jobs that included

that of: (1) a parts salesperson, *Dictionary of Occupational Titles* ("*DOT*") number 279.357-062, light and skilled with a specific vocational preparation ("SVP") of 5; (2) a parts manager, *DOT* number 185.167-038, light and skilled with an SVP of 7, but heavy with an SVP of 5 as performed, and (3) a parts-order-and-stock clerk, *DOT* number 249.367-058, light, but heavy as performed, and skilled with an SVP of 5. Tr. at 106–08. The VE categorized Plaintiff's PRW at Travel Centers of America as a combination of jobs that included: (1) a garage supervisor, *DOT* number 620.131-014, light, but heavy as performed with an SVP of 7; and (2) a service writer/automobile-repair-service estimator, *DOT* number 620.261-018, light, but heavy as performed, and skilled with an SVP of 7. Tr. at 108–12.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring she lift 10 pounds frequently and up to 20 pounds rarely or occasionally and sit, stand, and walk up to six hours each of an eight-hour day, for a total of eight hours with normal breaks every two hours; avoid climbing of ladders; occasionally perform all other postural activities due to fibromyalgia and arthritis; frequently engage in bilateral fine manipulation; avoid concentrated exposure to heat, cold, and humidity due to osteoarthritis; and avoid moderate exposure to hazards. Tr. at 112–13. The VE testified the hypothetical individual could not perform Plaintiff's PRW. Tr. at 113. He stated the hypothetical person would have the

following transferable skills to light work: clerical, numerical, office policies and procedures, documentation in maintenance of records, inventory control, stock control, verbal and written communication, customer service, use of office equipment and machinery, analytical problem-solving and decision-making, planning and organizing, supervisory and managerial, time management, and sales and marketing. Tr. at 113–14. The VE identified the following light jobs with an SVP of three that the hypothetical person could perform: inspector, *DOT* number 726.684-066; general clerk, *DOT* number 209.562-010; and cashier-checker, *DOT* number 211.462-014, with 81,000, 170,000, and 250,000 available positions nationally, respectively. Tr. at 115.

The ALJ described a second hypothetical that modified the first to limit the individual to sedentary work, which the VE testified would eliminate Plaintiff's PRW and the jobs identified in response to the first hypothetical. Tr. at 115–16. The ALJ further limited the individual to occasional handling and fingering with the left upper extremity due to a radial tear and frequent handling and fingering on the right; use of a cane for ambulation to and from the workstation; and a sit/stand option as pain and discomfort required. Tr. at 116–17. The VE testified that no jobs would be available for the hypothetical individual. Tr. at 117. The VE stated his testimony was consistent with the *DOT* and his experience. *Id.*

2.    The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

2.    The claimant has not engaged in substantial gainful activity since February 29, 2016, the alleged onset date (20 CFR 416.971 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: high blood pressure; Type II diabetes mellitus; osteoarthrosis; peripheral neuropathy; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she could lift/carry/push/pull 10 pounds frequently and 20 pounds occasionally. The claimant is able to sit for 6 hours, stand for 6 hours, and walk for 6 hours each for a total of 8-hours in a workday with usual breaks. She could occasionally climb stairs, occasionally balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. The claimant could frequently perform fine and gross manipulation bilaterally. She should avoid concentrated exposure to heat, cold, and humidity, and avoid moderate exposure to hazards.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on January 19, 1972 and was 44 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a, 404.1568(d), 416.969, and 416.969a, and 416.968(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 29, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 47–59.

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ erred in relying on the jobs identified by the VE because the RFC did not match the hypothetical question she posed to the VE; and

2) the ALJ did not adequately consider Dr. Korn's opinion in assessing Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

32

has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:   (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of

whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can

---

the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Availability of Jobs

Plaintiff argues the ALJ erred in relying on the VE's testimony to support the existence of jobs because the VE identified the jobs in response to a hypothetical question that differed from the RFC assessment she included in the decision. [ECF No. 10 at 6–8]. She specifically maintains the ALJ did not include a provision in the hypothetical question limiting the individual to frequent bilateral fine and gross manipulation. *Id.* at 8.

The Commissioner argues any error in the ALJ's failure to include a provision for frequent gross manipulation in her RFC assessment was harmless, as the job the VE identified and the ALJ cited in her decision of general clerk required no more than frequent gross manipulation and existed

in significant numbers in the economy. [ECF No. 15 at 11–12]. He maintains that while the VE responded that there would be no jobs in response to the second hypothetical question, the ALJ did not adopt the restrictions in that hypothetical question as representative of Plaintiff's RFC. *Id.* at 12–13.

In her reply brief, Plaintiff maintains that "[u]nless a VE specifically testifies that each of the jobs espoused were actually performable with the manipulative restrictions, the record cannot be said to have fully been developed" and she would "experience harm as the jobs may not be performable." [ECF No. 16 at 2].

At step five in the sequential evaluation process, "the Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The Social Security Administration ("SSA") relies primarily on the *DOT* for information about the requirements of work in the national economy, and ALJs should take administrative notice of information contained therein and consider it in assessing claimants' abilities to perform specific jobs. SSR 00-4p, 2000 WL 1898704, at *2 (2000); *see also* 20 C.F.R. §§ 404.1566(d), 416.966(d). In some cases, ALJs obtain testimony from VEs to address more complex issues, such as whether claimants' work skills can be use in other work and specific occupations that allow for use of particular skills. *Id.*; 20 C.F.R. §§ 404.1566(e), 416.966(e).

For a VE's opinion to support a finding that the claimant can perform specific jobs "it must be based upon a consideration of all the evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Johnson*, 434 F.3d at 659; *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but a VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

The ALJ did not rely strictly on the *DOT*, but instead solicited an opinion from a vocational expert. *See* Tr. at 104–17. During the hearing, she set forth the following hypothetical question:

> All right, I'm going to ask you a hypothetical person, age 46, with high school, plus some college; past relevant work same as the claimant's. Light work; 10 pounds frequently, up to 20 pounds rarely or occasionally; sit, stand, and walk up to six hours each of an eight-hour day, for a total of eight hours, with usual, normal breaks every two hours, for a total of eight hours; with no ladders. Occasional on all the postural. And that's due to the fibromyalgia and the other issues of arthritis and all. Fine manipulation, I'm going to put frequent bilateral on both. Avoid concentrated exposure to heat, cold, and humidity. That's for the osteoarthritis. Avoid moderate exposure to hazards, and no ladders . . . and occasional on all the other postural. And avoid heat, cold, humidity, and hazards.

Tr. at 112–13. The VE testified the hypothetical individual could perform jobs as an inspector, *DOT* number 726.684-066, a general clerk, *DOT* number 209.562-010, and a cashier-checker, *DOT* number 211.462-014, with 81,000, 170,000, and 250,000 positions in the national economy, respectively. Tr. at 113.

In her decision, the ALJ found Plaintiff had the RFC to perform light work, "except that she could lift/carry/push/pull 10 pounds frequently and 20 pounds occasionally," was "able to sit for 6 hours, stand for 6 hours, and walk for 6 hours each for a total of 8-hours in a workday with usual breaks," "could occasionally climb stairs, occasionally balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds," "could frequently perform fine and gross manipulation bilaterally," "should avoid concentrated exposure to heat, cold, and humidity, and avoid moderate exposure to hazards." Tr. at 50. She relied on the VE's testimony in concluding Plaintiff could perform jobs as an inspector, a general clerk, and a cashier checker. Tr. at 58–59.

Plaintiff correctly points out a discrepancy between the hypothetical question the VE responded to in identifying the jobs and the RFC assessment. The ALJ did not ask the VE to assume the hypothetical individual would be limited to frequent bilateral gross manipulation. *Compare* Tr. at 50, *with* Tr. at 112.

39

However, the ALJ also declined to incorporate in the RFC assessment the provisions in the second hypothetical question that the VE testified would result in no jobs. She did not limit Plaintiff to sedentary work involving occasional handling and fingering with the left upper extremity, use of a cane for ambulation to and from the work station, and a sit/stand option as pain and discomfort required. *Compare* Tr. at 50, *with* Tr. 116–17. As the VE testified there would be no jobs in response to a hypothetical question that included multiple restrictions the ALJ ultimately rejected, Plaintiff's reliance on the VE's testimony as to no jobs is misplaced.

Although the ALJ erred in relying on the jobs the VE identified in response to a hypothetical question that did not include all the restrictions she included in the RFC assessment, her error may be considered harmless[3] if consultation of the *DOT* reveals no conflict between the RFC assessment and the jobs' descriptions. Because the *DOT* is the primary source the SSA uses for information as to the requirements of specific jobs, it is not necessary that the ALJ consult a VE as to the vocational implications of every restriction, particularly where the *DOT* specifically addresses the issue. *See generally* SSR 00-4p, 2000 WL 1898704, at *2 (2000); 20 C.F.R. §§

---

[3] An ALJ's error is generally considered to be harmless where she "conducted the proper analysis in a comprehensive fashion," "cited substantial evidence to support [her] finding," and would have unquestionably "reached the same result notwithstanding [her] initial error." *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

404.1566(d), (e), 416.966(d), (e). Thus, if review of the jobs' descriptions in the *DOT* shows that they did not require more than frequent gross manipulation or handling, the ALJ's error may be deemed harmless because the primary source shows no conflict.

A review of the jobs of inspector and cashier-checker shows "Handling: Constantly—Exists 2/3 or more of the time." 726.684-066. INSPECTOR, SEMICONDUCTOR WAFER. DOT (4th ed. revised 1991), 1991 WL 679605; 211.462-014. CASHIER-CHECKER. *DOT* (4th ed. revised 1991), 1991 WL 671841. Because those jobs require constant gross manipulation, which is greater than the frequent gross manipulation specified in the RFC assessment, the ALJ cannot rely on them to meet the Commissioner's burden at step five.

A review of the job of general clerk shows it to require "Handling: Frequently–Exist from 1/3 to 2/3 of the time." 209.562-010. CLERK, GENERAL. DOT (4th ed. revised 1991), 1991 WL 671792. As the job of general clerk requires only frequent handling, the *DOT* suggests it is consistent with the provision in the RFC assessment for frequent gross manipulation.

"Work exists in the national economy where there is a significant number of jobs (in *one* or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational

qualifications." 20 C.F.R. §§ 404.1566(b), 416.966(b) (emphasis added). Therefore, the ALJ's citation of one job that accommodated the restrictions in the RFC assessment is sufficient, provided the job exists in significant numbers in the economy.

The SSA "consider[s] that work exists in significant numbers in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. §§ 404.1566(a), 416.966(a). It does not consider work to exist in significant numbers if it involves "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] lives." 20 C.F.R. §§ 404.1566(b), 416.966(b). The regulations do not define the term "significant numbers." However, the Fourth Circuit has previously found a job to exist in significant numbers where only a small number of jobs existed. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) ("We do not think that the approximately 110 jobs [in the regional economy] testified to by the VE constitute an insignificant number"); *see also Koonce v. Apfel*, 166 F.3d 1209 (Table), 1999 WL 7864, at *5 (4th Cir. 1999) (noting that even if the VE overestimated the number of jobs available, there would still be hundreds of jobs available, which would serve as significant numbers); *Hyatt v. Apfel*, 153 F.3d 720 (Table), 1998 WL 480722, at *3 (4th

Cir. 1998) (finding 650 jobs in the state economy served as significant numbers).

The VE testified to the existence of 170,000 general clerk positions in the national economy. Tr. at 115. Given Fourth Circuit precedent, it appears 170,000 jobs would constitute significant numbers under 20 C.F.R. § 404.1566 and § 416.966. The ALJ's identification of one job that existed in significant numbers in the economy is sufficient to meet her burden at step five. The court finds Plaintiff's argument unpersuasive, as the ALJ met her burden at step five through her conclusion that Plaintiff's RFC would allow her to perform the job of general clerk.

Nevertheless, the ALJ's conclusion at step five is only validated to the extent that substantial evidence supports her assessment of Plaintiff's RFC. Because Plaintiff challenges the ALJ's evaluation of specific evidence in determining her RFC, the court considers her second allegation of error.

### 2.    Dr. Korn's Opinion

Dr. Korn summarized his impressions from the consultative exam as follows:

> Left foot is very interesting. There are some obvious objective findings there as mentioned that would seem consistent with some of the pain issues she is describing. I think she would need to work predominantly in the seated position at this point, or at least in a job where she can move from the seated to standing position as her discomfort dictates. I tend to think the hand symptoms are predominantly due to the carpal tunnel syndrome and I believe she would have difficulty doing repetitive vigorous

manipulations with that hand on a consistent basis because of this condition. Her dexterity appears to be intact and it is just the first 3 digits of the right hand that are going to give her difficulty with the sensory disturbance. Grip strength appears to be reasonably intact, though her subjective discomfort from the neuropathy will play a role in her ability to utilize that grip.

Tr. at 444–45.

Plaintiff argues the ALJ failed to properly evaluate Dr. Korn's opinion prior to assessing her RFC. [ECF No. 10 at 10]. She maintains Dr. Korn's opinion is unrefuted by any evidence from other examining sources and based on his objective findings. *Id.* at 11–12.

The Commissioner argues the ALJ complied with the relevant rules and regulations and gave good reasons for declining to adopt Dr. Korn's opinion. [ECF No. 15 at 13]. He maintains the ALJ noted Dr. Korn had examined Plaintiff only once, was not a treating physician, relied on her subjective reports of pain, and failed to consider that her symptoms were successfully treated with injections. *Id.* at 14–15. He contends Plaintiff did not obtain specialized treatment targeting her hand symptoms after she reported them to Dr. Korn, but the ALJ, nevertheless, considered Dr. Korn's suggestions to the extent that she included a limitation to frequent fine manipulation. *Id.* at 15. He claims the ALJ's assessment of an RFC for light work was based on her review of all the relevant evidence. *Id.* at 16–17.

Pursuant to 20 C.F.R. § 404.1527(a)(1) and § 416.927(a)(1)[4] "[m]edical opinions are statements from acceptable medical sources that reflect judgment about the nature and severity of [the claimant's] impairments, including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." ALJs are required to "evaluate every medical opinion [they] receive." 20 C.F.R. §§ 404.1527(c), 416.927(c). If there is no treating source's opinion or if the treating source's medical opinion is not given controlling weight, five factors are utilized to determine what lesser weight should instead be accorded to the opinion. *Brown v. Commissioner Social Security Administration*, 873 F.3d 251, 256 (4th Cir. 2017). These factors include "[l]ength of the treatment relationship and the frequency of examination," "[n]ature and extent of the treatment relationship," "'[s]upportability' in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence—'particularly medical signs and laboratory findings'— substantiating it," "'[c]onsistency,' meaning how consistent the medical opinion is with the record as a whole,'" and "'[s]pecialization,' favoring 'the

---

[4] Because Plaintiff filed her claim prior to March 27, 2017, the court considers the ALJ's evaluation of medical opinions based on the rules codified by 20 C.F.R. § 404.1527 and § 416.927. *See* 20 C.F.R. § 404.1520c, § 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [§416.927] apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

medical opinion of a specialist about medical issues related to his or her area of specialty.'" *Id.* (citing 20 C.F.R. 404.1527(c)(2)(i), (ii), (3), (4), (5)). The ALJ should also consider "any other factors 'which tend to support or contradict the medical opinion.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(6)). Although the regulations provide that the SSA "[g]enerally . . . give[s] more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [her]," nothing in the regulations or controlling decisions requires ALJs to adopt an examining physician's opinion if the other factors in 20 C.F.R. § 404.1527 and § 416.927 do not support that opinion.

As the RFC assessment should consider all the relevant evidence and account for all of the claimant's medically-determinable impairments, appropriate assessment of the claimant's RFC necessarily requires evaluation of all medical opinions of record. *See generally* 20 C.F.R. §§ 404.1545(a), 416.945(a), 404.1527(c), 416.927(c). The RFC assessment must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. SSR 16-3p, 2016 WL 1119029, at *7. "[R]emand may be appropriate

. . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ summarized Dr. Korn's impressions as follows:

Dr. [Korn's] examination of the claimant's musculoskeletal system in June 2016 noted that there was no evidence of edema (Ex. 5F at 1) . . . . She had pitting edema in her bilateral lower extremities and some additional edema in her left foot that did not pit (Ex. 5F at 2). Dr. Korn's inspection of the claimant's lumbar spine was normal and while the claimant had mild lateral compartment crepitus in her left knee with McMurray's maneuver, she was able to squat fully and arise (Ex. 5F at 3). However, she could not actively flex any of the MTP joints on the left foot beyond the neutral position, but her extension appeared normal (Ex. 5F at 3). The claimant could not tandem walk well, could not heel-toe walk, and her gait was somewhat widened (Ex. 5F at 3–4). She also had loss of sensation in the tips of her toes, but again, her squat was normal (Ex. 5F at 3–4). In addition, despite her testimony during the hearing that she "always" used a cane for ambulation outside of the house, she did not use an assistive device for ambulation during the examination (Ex. 5F at 4). The claimant's hands were normal, but she did have some loss of discrimination in her right hand (Ex. 5F at 3–4). Nonetheless, the claimant did not have a tremor and Dr. Korn noted that her fine dexterity appeared reasonably normal (Ex. 5F at 4). At the conclusion of the examination, the consultative examiner diagnosed her with diabetic peripheral neuropathy, possible diabetic foot changes, left foot, posttraumatic degenerative joint disease in her left wrist, severe morbid obesity, and carpal tunnel syndrome in her right upper extremity (Ex. 5F at 4).

Tr. at 52–53

The ALJ gave "limited weight" to Dr. Korn's opinion, writing:

> Dr. Korn only had the opportunity to examine the claimant on a single occasion and was not a treating provider. His opinion relied a lot on the claimant's subjective complains of pain and he even stated that it was her subjective discomfort that would limit the claimant's ability to grip, even though her grip strength and discrimination was reasonably intact. In addition, the consultative examiner based his diagnosis of the claimant's carpal tunnel syndrome on her report of a history of this condition in her right hand, but did not account for her statement that she stated that she received injections, which were successful (Ex. 5F at 1). Further Dr. Korn did not order an EMG to independently evaluate the claimant's subjective complaints. Accordingly, the undersigned finds that this opinion is entitled to limited weight.

Tr. at 56–57.

Dr. Korn's opinion is not clear with respect to manipulative limitations, as he does not present limitations in specific vocational terms. *See* Tr. at 444–45 (noting "difficulty doing repetitive vigorous manipulations with [right] hand on a consistent basis," difficulty with sensory disturbance in first three digits of the right hand, and difficulty with grip imposed by subjective discomfort). Substantial evidence supports the ALJ's rejection of Dr. Korn's opinion that Plaintiff would have difficulty with grip based on the supportability and consistency factors in 20 C.F.R. § 404.1527(c)(3) and (4) and 416.927(c)(3) and 4, as the ALJ recognized that Dr. Korn found Plaintiff to have intact grip strength and the record contains no additional assessments of her grip strength for comparison. *See* Tr. at 445. Because Dr. Korn observed Plaintiff's dexterity and grip strength to be intact and did not specify whether she could perform occasional, frequent, or constant fine and

gross manipulation, the ALJ's inclusion in the RFC assessment of provisions for frequent fine and gross manipulation with the bilateral hands is not inconsistent with Dr. Korn's opinion.[5]

Although the ALJ cited reasons consistent with 20 C.F.R. § 404.1527(c) and 416.927(c) to support her allocation of limited weight to Dr. Korn's opinion as to Plaintiff's manipulative abilities, she did not specifically acknowledged or address his impression that Plaintiff would require a sedentary job or one with an at-will sit/stand option based on problems with her lower extremities. She referenced no evidence in her discussion of Dr. Korn's exam or the opinion as a whole that suggested this particular aspect of his opinion was unsupported by his records or inconsistent with the other evidence of record. *See* Tr. at 52–53, 56–57. In fact, the ALJ noted findings from Dr. Korn's exam that would tend to support his opinion, including evidence of pitting edema in Plaintiff's bilateral lower extremities, non-pitting edema in her left foot, mild lateral compartment crepitus in her left knee, inability to flex the MTP joints on the left foot beyond the neutral position, difficulty tandem walking, inability to heel-toe walk, widened gait, and loss of sensation in the tips of her toes. Tr. at 52.

---

[5] As Plaintiff challenges the manipulative limitations in the context of the ALJ's evaluation of Dr. Korn's opinion, the court has accordingly limited its inquiry with respect to the manipulative limitations in the RFC assessment.

The court has reviewed the ALJ's decision in its entirety in assessing whether she cited substantial evidence to refute Dr. Korn's opinion that Plaintiff would require sedentary work or an at-will sit/stand option elsewhere in the decision. This review shows that the ALJ recognized some evidence that would suggest sedentary work or an at-will sit/stand option was not necessary. Tr. at 51 (stating Plaintiff reported walking for 30 minutes and doing light weight-bearing exercises in March 2016; noting that a June 2016 exam showed no evidence of edema, cyanosis, varicosities, or palpable cord and normal gait and station); Tr. at 52 (pointing out that Plaintiff did not require surgery to correct abnormalities in her feet); Tr. at 53 (noting that during an exam with Dr. Cole two days after her visit with Dr. Korn, Plaintiff "was still ambulating normally, had a normal gait and station," "did not exhibit any edema," and "maintained normal tone and motor strength and normal movement in all her extremities"; stating Plaintiff "maintained normal range of motion" and had "no deformities in her feet" upon examination in February 2017; indicating arterial studies showed no significant disease in April 2017; stating that in June 2017, Dr. Walton "noted that she maintained normal range of motion in her feet and while she still had diminished sensation in both feet, there was an improvement from February 2017, when she had no sensation in her feet"); Tr. at 54 (maintaining that even when Plaintiff had infection to her feet, she

"maintained 5/5 strength throughout," had normal vascular pulses, and showed no other abnormalities); Tr. at 55 (noting that Dr. Newman recommended in July 2018 that Plaintiff ride a stationary bike with resistance four-to-five times per week).

However, the ALJ also acknowledged evidence that suggested Plaintiff would be limited in her abilities to engage in prolonged standing and walking. *See* Tr. at 51 (stating Plaintiff "ha[d] consistently exhibited diminished sensation in her bilateral feet that reasonably limited the amount of time that she was able to walk"); Tr. at 52 (noting imaging showed evidence of mild DJD and small calcaneal spurs in both feet in January 2016; conceding that Plaintiff's obesity likely exacerbated her pain); Tr. at 53 (recognizing that Plaintiff reported experiencing painful neuropathy and lacked sensation during a February 2017 visit with Dr. Walton and that Dr. Walton felt that her neuropathy prevented exercise); Tr. at 54–55 (indicating Plaintiff developed infected ulcers in both feet that required extended wound care; referencing Plaintiff's use of a cane; acknowledging Plaintiff's April 2018 fall).

The ALJ concluded "the record shows that the claimant is capable of performing work at the light exertional level with the additional limitations set forth above." Tr. at 51. However, in contravention of SSRs 96-8p and 16-3p, she did not explain how she reconciled the evidence she referenced in

reaching her conclusion. Because the ALJ neither addressed Dr. Korn's opinion that Plaintiff would require sedentary work or an at-will sit/stand option nor reconciled the evidence that was contrary to a conclusion that she could perform light work, the court cannot find that substantial evidence supports her evaluation of Dr. Korn's opinion and her assessment of an RFC for light work.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 28, 2020                    Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge